ACCEPTED
15-25-00013-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
7/10/2025 4:53 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-25-00013-CV

## In the Fifteenth Court of Appeals
## Austin, Texas

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
7/10/2025 4:53:04 PM
CHRISTOPHER A. PRINE
Clerk

State of Texas, the Texas Facilities Commission, the Texas Health and Human Services Commission, Mike Novak, in his Official Capacity as Executive Director of TFC, and Rolland Niles, in his Official Capacity as Deputy Executive Commissioner for the System Support Services Division of the Texas Health and Human Services Commission,

*Appellants,*

v.

Broadmoor Austin Associates, a Texas joint venture,
*Appellee.*

On Appeal from Cause No. D-1-GN-23-007899
In the 455th Judicial District of Travis County, Texas

## REPLY BRIEF OF APPELLANTS

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Ralph Molina
Deputy First Assistant Attorney General

Austin Kinghorn
Deputy Attorney General for Civil Litigation

Kimberly Gdula
Division Chief
General Litigation Division

Jennifer Cook
Assistant Attorney General
Texas Bar No. 00789233
P.O. Box 12548/Mail Stop 019-1
Austin, Texas 78711-2548
Tel: (737) 230-4700
Fax: (512) 302-0667
jennifer.cook@oag.texas.gov

**Counsel for Appellants**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES .........................................................................3

SUMMARY...........................................................................................5

REPLY TO APPELLEE'S STATEMENT OF FACTS................................6

ARGUMENT.......................................................................................16

I.  Contrary to Appellee's assertion, the breach of contract claim at issue does not come within Chapter 114 of the Texas Civil Practices & Remedies Code. ..................................................................................16

    A.  The contract at issue falls within Chapter 2167 of the Government Code, which expressly involves two state agencies and the State of Texas as lessee; in contrast, Chapter 114 requires a contract for a single state agency...16

        1.  Contracts covered by Chapter 114 and the waiver of immunity..17

        2.  Leases in Chapter 2167, such as this Lease. ................................18

        3.  A Chapter 2167 lease is not subject to the waiver of immunity in Chapter 114......................................................................................19

    B.  The allegations show the Lease was complied with so there is no breach of any express provision. ..............................................................21

II.  Appellants acted in accordance with their authority under the law; there is no viable ultra vires cause of action. ........................................23

    A.  Niles was not required to certify funds were available to pay for the Lease.  ……………………………………………………………….23

    B.  Novak and TFC properly terminated the Lease.............................27

        1.  There is no legal requirement that TFC or Novak do an independent determination regarding HHSC's funding. ...................................28

        2.  There was no authority or reason for TFC or Novak to question HHSC's funding determination...................................................29

    C.  Appellee's ultra vires claim fails because Appellee seeks retroactive relief.  ……………………………………………………………….32

III. Appellee's UDJA claim is an improper attempt to circumvent sovereign immunity's bar on Appellee's breach of contract claim. ..............................33

    CONCLUSION...................................................................................34

    CERTIFICATE OF COMPLIANCE .......................................................35

# INDEX OF AUTHORITIES

Cases

*City of El Paso v. Heinrich,*
    284 S.W.3d 366 (Tex. 2009) ..............................................................33

*City of Houston v. Houston Mun. Emps. Pension Sys.,*
    549 S.W.3d 566 (Tex. 2018) ................................................... 26, 33

*City of Lancaster v. Chambers,*
    883 S.W.2d 650 (Tex. 1994) ..............................................................26

*Progressive Cnty. Mut. Ins. Co. v. Caltzonsing,*
    658 S.W.3d 384 (Tex. App.—Corpus Christi-Edinburg 2022,
    no pet.) ..............................................................................................32

*Southwest Pharmacy Sols., Inc. v. Texas Health & Human Servs.
    Comm'n,*
    No. 03-11-00802-CV, 2013 WL 3336868, at *2 (Tex. App.—
    Austin June 27, 2013, no pet.) (mem. op.) ......................................33

*Sw. Bell Tel., L.P. v. Emmett,*
    459 S.W.3d 578 (Tex. 2015) ................................................... 25, 26

*Tex. Dep't of Transp. v. Sefzik,*
    355 S.W.3d 618 (Tex. 2011) ..............................................................34

*Town of Shady Shores v. Swanson,*
    590 S.W.3d 544 (Tex. 2019) ..............................................................16

Statutes

Act of May 27, 2023, 88th Leg., R.S., ch. 1170 § 1, art. II sec. 1 .................... 26, 34

Tex. Civ. Prac. & Rem. Code § 114.001 ....................................... 17, 20

Tex. Civ. Prac. & Rem. Code § 114.002 ................................................17

Tex. Civ. Prac. & Rem. Code § 114.003 .................................. 17, 20, 21

Tex. Civ. Prac. & Rem. Code § 114.004 ...............................................20

Tex. Gov't Code § 2167.002 .................................................................18

Tex. Gov't Code § 2167.055 ..................................................... 18, 19, 28

Tex. Gov't Code § 2167.101 ............................................. 19, 24, 29, 30

Rules

1 Tex. Admin. Code §§ 115.20-.22 ........................................................................32

Texas Rule of Appellate Procedure 9.4 ...............................................................36

**SUMMARY**

First, in Appellee's brief ("Appellee's Brief"), Appellee's claim that the waiver in chapter 114 of the Civil Practice & Remedies Code ("Chapter 114") applies to the lease at issue ("Lease") is without merit. Contracts covered by Chapter 114 involve one state agency that enters into a contract, is bound by the terms of the contract, and receives the goods/services provided for in the contract; that is not the situation in this case. As a result, Appellee cannot rely on Chapter 114 to overcome Appellants' sovereign immunity.

Second, contrary to Appellee's assertion, there is no viable ultra vires claim against either Roland Niles ("Niles") of the Texas Health and Human Services Commission ("HHSC") or Mike Novak ("Novak") of the Texas Facilities Commission ("TFC"). HHSC, within its authority, made prudent decisions to ensure future costs were covered; such decisions involved complicated analysis of numerous variables and unknown future contingencies. As part of that evaluation, Niles, within HHSC's discretion, did not certify funds were available for the Lease. TFC did exactly as required when an agency, HHSC in this case, informs TFC funds are not available and does not certify funds are available—it terminated the Lease on behalf of the State.

Third, Appellee's attempt to use the Uniform Declaratory Judgment Act ("UDJA") to circumvent sovereign immunity also fails. This is nothing more than a

5

breach of contract action which is barred by sovereign immunity; there is no basis or jurisdiction for a private party to request a declaration that a general appropriations bill, which does not mention that party at all, entitled that party to funds—all in support of a barred breach of contract claim.

## REPLY TO APPELLEE'S STATEMENT OF FACTS

Appellee claims this case is about simple math, but that is the furthest thing from the truth. Appellee claims there is no possible way HHSC could have determined it had insufficient funds to fund the Lease. A review of undisputed facts ignored by Appellee shows the complexity, the variables and the uncertainty involved due to unknown future contingencies.

As Appellee notes, in September 2022, HHSC provided an appropriations request to the legislature for fiscal year 2024 ("FY24") and fiscal year 2025 ("FY25") (collectively the "Biennium"). Appellee's Brief at 170-73 (Tab 6). In making this request, HHSC necessarily had to make projections based on unknown future conditions and costs for FY 24 and FY 25 that were not yet fixed.

In HHSC's base appropriations request for rent, HHSC asked for $105,369,343 for FY24 and $105,245,466 for FY25. *See* CR at 270.[1] As part of its

---

[1] References to the clerk's record will be "CR at [page no(s).]." References to the reporter's record will be "[volume no.] RR at [page no(s).]."

requests for exceptional items, HHSC asked for additional amounts for rent: $29,601,496 for FY24 and $41,826,148 for FY25. Appellee's Brief at 171 (Tab 6).

HHSC's comments regarding its exceptional item request for rent reflects the complexities, the many variables, and the future uncertainties involved. For this additional rent request, HHSC states:

> The first component is for leases. HHS has experienced a steady increase in lease costs from FY 2017 and costs increased significantly from $93.9 million in FY 2021 to an estimated $102.2 million in FY 2022. The increase in lease costs has required HHSC to reduce support costs including onsite security and monitoring, custodial services, building maintenance, pest control, HVAC and plumbing services. HHSC does not have the ability to absorb further cost increases without closing public facing offices. This item includes an assumed 9.9% year-over-year increase in the Consumer Price Index for the 2024-25 biennium.

*Id*. In this statement, HHSC explains lease costs have been increasing requiring HHSC to reduce lease support costs to absorb the increasing costs. HHSC identified components of lease support costs at issue to include:

- Onsite security and monitoring
- Custodial services
- Building maintenance
- Pest control
- HVAC and plumbing services

*Id*. Significantly, Appellee ignores these lease support costs in its analysis. Appellee tries to portray a simple math analysis. This is an example in which Appellee fails to acknowledge there are multiple variables that impact the certification for funding

and the analysis can be complex. HHSC explains it cannot absorb further support cost increases without shutting offices. *Id.*

As stated in the above quote, HHSC explains the calculation of its rent exceptional item request includes an "assumed 9.9% year-over-year increase in the Consumer Price Index for the 2024-25 biennium." *Id.* This number is significant because it reflects the financial environment at the time HHSC was evaluating its funding. HHSC notes in its request that "**Each Lease permits a Consumer Price Index (CPI) escalation clause** that will allow the lessor to request an increase yearly." *Id.* at 172 (emphasis added). In fact, these CPI escalation clauses are in the State lease template, and there is one in the Lease. CR at 282-84. These clauses allow for annual rent increases based on the CPI, to be determined on each anniversary of the lease commencement, which would be different for each lease. Here, the Lease CPI escalation amount was calculated in August of each year. *Id.* Below for

reference is a copy of the CPI Escalation Clause in its entirety:

6.  CPI ESCALATION CLAUSE

(a) On each anniversary date of the lease commencement, the total monthly rent of the lease shall be adjusted by changes in the Consumer Price Index (CPI) reflecting percentage increases.

(b) To receive the CPI adjustment, the Lessor must submit a request in writing **by certified mall, return receipt requested,** and received by the Texas Facilities Commission (TFC) no later than forty-five (45) days after the anniversary date for that year. In determining whether to grant Lessor's request for a CPI increase, in whole or in part, TFC may review and consider Lessor's performance under this lease and whether any material or substantive issues with the leased premises of which Lessee has provided prior timely notice to Lessor remain unresolved, as provided in Section 7(k) below.

(c) The percent escalation allowable will be based on the percent change in the CPI for Urban Wage Earners and Clerical Workers, Current Series (CPI-W, U.S. City Average, All Items) published by the United States Department of Labor, Bureau of Labor Statistics. The index may be obtained from the U.S. Bureau of Labor Statistics web site at **www.bls.gov.**

The index month three (3) months prior the anniversary month for the current year and the previous year shall be used to determine the percent increase.

(d) Base Factor of 50% of the monthly rent will be used in the calculation for the escalation in accordance with the following schedule:

| Base Factor Percent | Paying Utilities | Paying Janitorial |
|---|---|---|
| 50% | Lessor | Lessor |

Lease # 20392 Austin

(e) **EXAMPLE (Calculation formula with a 50% Base Factor):**

Part 1.

| CPI Current Year | | CPI Previous Year | Difference | Divided by Previous Year | | % Change |
|---|---|---|---|---|---|---|
| (Mar 04) 182.9 | - | (Mar 03) 180.3 | = 2.6 | / 180.3 | | = 1.4 |

Part 2.

| Current Monthly Rent | | % Base Factor | | | % Change | Rent Increase |
|---|---|---|---|---|---|---|
| $2,500.00 | x | 50% | = $1,250.00 | x | 1.4 | = $17.50 |

Part 3.

| Current Monthly Rent | | CPI Increase | | New Monthly Rent |
|---|---|---|---|---|
| $2,500.00 | + | $17.50 | = | $2,517.50 |

(f) The first eligible CPI rent adjustment for this lease will be **August 1, 2016,** based upon the percent change in the CPI from **May 2015** and **May 2016** using a Base Factor of **50%.** Each succeeding year, the same procedure as outlined in paragraph (e) above will be used.

9

*Id*. This is another example of a complex and uncertain variable ignored by Appellee, that HHSC must consider in it's analysis when reviewing all leased properties occupied by HHSC and available funding.

In its appropriations request, HHSC noted as of August 2022, "CPI in Texas increased by 9.9% over the previous year." Appellee's Brief at 172 (Tab 6). During this timeframe, there had been recent historically significant increases in the CPI. In 2021, 2022 and the beginning of 2023, the CPI reflects substantial increases compared to other times. In 2022 particularly, there were annual increases of up to 9.8% for the Lease CPI which is much higher compared to other times, such as 1.6%

in January 2021; the graphic below shows the historically high CPI annual

percentage increases of 2022:

**CONSUMER PRICE INDEX FOR URBAN WAGE EARNERS AND CLERICAL WORKERS (CPI-W)**
(not seasonally adjusted)

| ALL ITEMS (1982-84=100) | U.S. City Average | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| **Consumer Price Index** | | | | | | | | | | | | |
| 2015 | 228.294 | 229.421 | 231.055 | 231.520 | 232.908 | 233.804 | 233.806 | 233.366 | 232.661 | 232.373 | 231.721 | 230.791 |
| 2016 | 231.061 | 230.972 | 232.209 | 233.438 | 234.436 | 235.289 | 234.771 | 234.904 | 235.495 | 235.732 | 235.215 | 235.390 |
| 2017 | 236.854 | 237.477 | 237.656 | 238.432 | 238.609 | 238.813 | 238.617 | 239.448 | 240.939 | 240.573 | 240.666 | 240.526 |
| 2018 | 241.919 | 242.988 | 243.463 | 244.607 | 245.770 | 246.196 | 246.155 | 246.336 | 246.565 | 247.038 | 245.933 | 244.786 |
| 2019 | 245.133 | 246.218 | 247.768 | 249.332 | 249.871 | 249.747 | 250.236 | 250.112 | 250.251 | 250.894 | 250.644 | 250.452 |
| 2020 | 251.361 | 251.935 | 251.375 | 249.515 | 249.521 | 251.054 | 252.636 | 253.597 | 254.004 | 254.076 | 253.826 | 254.081 |
| 2021 | 255.296 | 256.843 | 258.935 | 261.237 | 263.612 | 266.412 | 267.789 | 268.387 | 269.086 | 271.552 | 273.042 | 273.925 |
| 2022 | 276.296 | 278.943 | 283.176 | 284.575 | 288.022 | 292.542 | 292.219 | 291.629 | 291.854 | 293.003 | 292.495 | 291.051 |
| 2023 | 293.565 | 295.057 | 296.021 | 297.730 | 298.382 | 299.394 | 299.899 | 301.551 | 302.257 | 302.071 | 301.224 | 300.728 |
| 2024 | 302.201 | 304.284 | 306.502 | 307.811 | 308.163 | 308.054 | 308.501 | 308.640 | 309.046 | 309.358 | 308.998 | 309.067 |
| 2025 | 311.172 | 312.460 | 313.250 | 314.243 | 314.839 | | | | | | | |
| **Percent change from 12 months ago** | | | | | | | | | | | | |
| 2015 | -0.8 | -0.6 | -0.6 | -0.8 | -0.6 | -0.4 | -0.3 | -0.3 | -0.6 | -0.4 | 0.1 | 0.4 |
| 2016 | 1.2 | 0.7 | 0.5 | 0.8 | 0.7 | 0.6 | 0.4 | 0.7 | 1.2 | 1.4 | 1.5 | 2.0 |
| 2017 | 2.5 | 2.8 | 2.3 | 2.1 | 1.8 | 1.5 | 1.6 | 1.9 | 2.3 | 2.1 | 2.3 | 2.2 |
| 2018 | 2.1 | 2.3 | 2.4 | 2.6 | 3.0 | 3.1 | 3.2 | 2.9 | 2.3 | 2.7 | 2.2 | 1.8 |
| 2019 | 1.3 | 1.3 | 1.8 | 1.9 | 1.7 | 1.4 | 1.7 | 1.5 | 1.5 | 1.6 | 1.9 | 2.3 |
| 2020 | 2.5 | 2.3 | 1.5 | 0.1 | -0.1 | 0.5 | 1.0 | 1.4 | 1.5 | 1.3 | 1.3 | 1.4 |
| 2021 | 1.6 | 1.9 | 3.0 | 4.7 | 5.6 | 6.1 | 6.0 | 5.8 | 5.9 | 6.9 | 7.6 | 7.8 |
| 2022 | 8.2 | 8.6 | 9.4 | 8.9 | 9.3 | 9.8 | 9.1 | 8.7 | 8.5 | 7.9 | 7.1 | 6.3 |
| 2023 | 6.3 | 5.8 | 4.5 | 4.6 | 3.6 | 2.3 | 2.6 | 3.4 | 3.6 | 3.1 | 3.0 | 3.3 |
| 2024 | 2.9 | 3.1 | 3.5 | 3.4 | 3.3 | 2.9 | 2.9 | 2.4 | 2.2 | 2.4 | 2.6 | 2.8 |
| 2025 | 3.0 | 2.7 | 2.2 | 2.1 | 2.2 | | | | | | | |

Appellee's Brief at 80 (Tab 1) (contractual provision referencing the CPI and

www.bls.gov).[2] HHSC's exceptional item request for additional rent based on a

---

[2] The CPI-W, U.S. City Average, All Items index is used, which is the same index used in the Lease at issue in this case.
https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexhistorical_us_table.htm.

9.9% annual CPI increase reflected a real concern regarding these historically high increases and the uncertainty of whether these increases would continue. This impacted virtually all leases for properties occupied by HHSC.

Appellee ignores the fact that when making decisions about available funding, the decisionmaker is trying to predict the future; actual amounts ultimately spent years later is information unknown at the time of making the decision. In fact, in order to prevail on any claims (breach of contract or ultra vires), one hurdle Appellee fails to address is that Appellee would need to prove these state officials knew the future financial situation when making decisions about future funding availability— Appellee would have to prove the state actors knew the future. This, of course, is impossible.

In its appropriations request, HHSC identified other uncertainties and concerns about funding. HHSC anticipated having to request new leases to replace older leases and anticipated "new facility costs will be higher per square foot." Appellee's Brief at 172 (Tab 6). HHSC further explained, "the probability of additional facility replacements occurring in the future is high" because some locations are old, and HHSC's business processes change over time. *Id*. This is another potentially high-cost contingency HHSC needed to be prepared for that Appellee ignores.

When the amounts of all HHSC requests for leases are viewed in total (by adding the base rent request plus the exceptional item rent request), HHSC requested $134,970,839 for FY24 and $147,071,614 for FY25.

12

On May 27, 2023, the legislature passed the appropriations bill and even though it was not final, HHSC was going to receive less than its requested amounts. *See* Appellee's Brief at 13. HHSC received $118,826,243 for FY24 and $119,751,160 for FY25. *Id.* The breakdown is as follows:

| Source of funds | FY 2024 | FY 2025 |
|---|---|---|
| Base rent request | $105,369,343 | $105,245,466 |
| Exceptional item rent request | $29,601,496 | $41,826,148 |
| Total requested | $134,970,839 | $147,071,614 |
| Amount appropriated | $118,826,243 | $119,751,160 |
| **Difference between request and appropriations** | **-$16,144,596** | **-$27,320,454** |

So, one of Appellee's premises—that HHSC received more than it requested—is not correct. HHSC received less. Appellee claims the exceptional items are "wish list" items; Appellee relies on a guidance document from a state political subdivision not involved in this case, which is not in evidence and not law. Appellee's Brief at 11-12. Yet, in the request, HHSC informs the legislature it may have to close offices as a result of funding issues; this does not read like a wish list. Appellee's Brief at 171 (Tab 6). The request was based on actual CPI increases at the time. This request cannot be disregarded.

Appellee asserts the Lease termination during this timeframe could not have had any merit. Yet, decisions about funds available are made before the funds are

spent and with many considerations, such as the support costs and the need to upgrade old leases to newer facilities discussed above. Again, in order for Appellee's theory to hold water would require state decision-makers to know the future, such as future CPIs; that is just not possible.

The funding decisions for FY24 leases in this case were being made in the first half of 2023. Determining the adequacy of funding for future years is no ministerial task—it takes judgement, and necessarily discretion.

In a request to TFC dated May 31, 2023, after the appropriations bill was passed, HHSC requested to terminate the Lease and stated it was moving all staff from Appellee's facility. CR at 316-18. In HHSC's explanation for the request, HHSC stated it was "due to the non-availability of money" appropriated. *Id.* at 317.

Appellee claims HHSC was moving out of Appellee's facility in January 2023. Appellee's Brief at 10. Even taking Appellee's claim as true, it is unremarkable that HHSC would necessarily be evaluating leased properties and making decisions about the future before May 2023.

After receiving information from HHSC that there was not going to be funding for the Lease, TFC, consistent with its responsibility, sent Appellee a notice of termination in a letter dated June 1, 2023. CR at 320-21.

In July 2023, TFC, as part of its responsibility each biennium, requested HHSC's certification of current leases. CR at 323-328. Attached to TFC's request is

a 5-page spreadsheet with a list of numerous leases all over the state totaling approximately 3,365,355 square feet of leased space and for 13,629 full-time employees. *Id*. at 328.

HHSC responded by certifying all but five. Appellee's simple math calculation does not take into consideration that many leases in locations all over the state were considered and that five were not certified, not just Appellee's Lease. Appellee's claim that its Lease was required to be funded ignores the complexities involved.

Appellee asserts Appellants breached the Lease and acted ultra vires relying on simple math, based on what was requested, what was approved and what was spent. Appellee treats rent costs as fixed, but they were not. Appellee ignores variables—like CPI escalation clauses, lease support services, and the future need for newer facility leases. Additionally, Appellee assumes HHSC can predict the future when making decisions; Appellee claims by seeing how much was spent on "rent" in FY24, HHSC should have certified funds available for the Lease back in 2023. Of course, when HHSC has to make fiscal decisions that impact future years, it does not have the ability to know the future.

## ARGUMENT

Appellee bears the burden of establishing a valid waiver of sovereign immunity. *See Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019). Appellee puts forth three arguments as to why sovereign immunity has been waived: the Lease falls within Chapter 114's waiver of sovereign immunity; Niles and Novack acted ultra vires, for which there is no sovereign immunity bar; and the claims fall within the UDJA's waiver of sovereign immunity. As described below and in Appellants' Brief, each of these arguments fails, and the trial court erred in denying-in-part the plea to the jurisdiction.

**I.     Contrary to Appellee's assertion, the breach of contract claim at issue does not come within Chapter 114 of the Texas Civil Practices & Remedies Code.**

This Lease does not fit within Chapter 114 and according to the allegations, all lease provisions were complied with so there is no express provision alleged to be breached.

**A.     The contract at issue falls within Chapter 2167 of the Government Code, which expressly involves two state agencies and the State of Texas as lessee; in contrast, Chapter 114 requires a contract for a single state agency.**

While Appellee relies on dictionary definitions, principal/agency concepts, and landlord/tenant tenets, among other things, reading the plain and express language of the statutes involved shows a lease under Chapter 2167 is incompatible and does not fit within a contract under Chapter 114.

**1.  Contracts covered by Chapter 114 and the waiver of immunity.**

Contracts subject to a Chapter 114 challenge must state "the essential terms of the agreement for providing goods or services to the state agency" and be executed by a state agency for that state agency. *See* Tex. Civ. Prac. & Rem. Code §§ 114.001, 114.002, and 114.003. In Chapter 114 claims, only one state agency is involved in executing the contract and obtaining the goods and services under the contract. The waiver of immunity in Chapter 114 states:

> WAIVER OF IMMUNITY TO SUIT FOR CERTAIN CLAIMS. A **state agency that is authorized by statute or the constitution to enter into a contract and that enters into a contract** subject to this chapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of an express provision of the contract, subject to the terms and conditions of this chapter.

Tex. Civ. Prac. & Rem. Code § 114.003 (emphasis added). In Chapter 114, the waiver of immunity is only by a state agency that enters into the contract.

Chapter 114 involves a contract with one state agency. The definition of "contract subject to this chapter" is:

> a written contract stating the essential terms of the agreement **for providing goods or services to the state agency** that is **properly executed on behalf of the state agency**.

*Id.* § 114.001(2) (emphasis added). According to this provision, the state agency that executes the contract is also provided the goods and services of the contract. A

Chapter 2167 contract does not fit within these parameters. A contract under Chapter 2167, involves two different state agencies and the State as lessee.

**2.      Leases in Chapter 2167, such as this Lease.**

Chapter 2167 states the State is the lessee—not a state agency. Section 2167.055 states:

> CONTRACT FOR LEASE OF SPACE. (a) In a contract by the commission [TFC] for the lease of space under this chapter, **the state, acting through the commission [TFC], is the lessee**.

Tex. Gov't Code § 2167.055(a) (emphasis added). In a Chapter 2167 lease, *the State is the lessee* and a party to the lease while TFC acts as an agent for the State. While the State is the lessee and TFC executes the contract on behalf of the State as lessee, TFC does not occupy the leased premises or pay for the leased premises. Pursuant to Section 2167.002, the state agency occupying the leased space pays the lease. Section 2167.002 states:

> PREREQUISITES FOR LEASING SPACE. (a) The commission may lease space for a state agency in accordance with this chapter and the agency's specifications if: (1) state-owned space is not otherwise available to the agency; and (2) the agency has verified it has money available to pay for the lease.

Tex. Gov't Code § 2167.002. Additionally, Section 2167.101 provides:

> CERTIFICATION OF AVAILABLE MONEY. A state agency occupying space leased under this chapter shall certify to the commission [TFC], at least 60 days before the beginning of each fiscal biennium during the lease term, that money is available to pay for the lease until the end of the next fiscal biennium.

Tex. Gov't Code § 2167.101. According to these provisions, it is the occupying agency who pays for the lease and is required to certify if money is available before each fiscal biennium. In this case, HHSC is the occupying agency. While HHSC pays for the lease from its budget, HHSC is not a party to the lease contract. Under the scheme in Chapter 2167, the legislature chose to make the State of Texas the lessee (not a state agency), have one state agency (TFC) execute and oversee the lease contracts on behalf of the State lessee, and inure to the benefit of a second occupying state agency (HHSC), which is not a party to the lease. Such a statutory scheme and type of contract is inconsistent with the waiver of sovereign immunity in Chapter 114.

### 3. A Chapter 2167 lease is not subject to the waiver of immunity in Chapter 114.

HHSC never entered into the Lease and thus by the express terms of the statutory waiver, it does not apply to HHSC. It also does not apply to TFC because TFC executes the contract not as a party to the contract because Chapter 2167 makes clear the State is the lessee and thus the party to the contract—not TFC.

Under Chapter 2167, the legislature expressly chose to make the State, not a state agency, the lessee. Tex. Gov't Code § 2167.055. TFC acts on behalf of the State, as lessee. TFC does not execute the contract for itself and does not receive any goods or services provided in the contract. *Id.* TFC's actions in signing the contract are for the benefit of the State, as lessee. So, the waiver in Chapter 114 does not apply to TFC.

This also makes sense as TFC does not budget for the Chapter 2167 leases and does not have funds allocated to pay for any goods and services provided under these lease contracts; it is the occupying agency who pays rent in Chapter 2167 lease contracts. Were TFC held liable under Chapter 114, one of the main components that could be recovered is "the balance due and owed by the state agency under the contract." Tex. Civ. Prac. & Rem. Code § 114.004(a)(1). As a result, if Chapter 114 were held applicable to TFC for lease contracts, TFC could be responsible for amounts owed by the occupying agency, which was clearly not the intent of the legislature.

Chapter 114 also does not apply to entities who are not a party to the contract, such as TFC and HHSC. The legislature chose in Chapter 2167 to make the State, not one of its agencies, the lessee and party to the contract. In Chapter 114, the waiver of immunity only applies when a state agency enters into a contract. Tex. Civ. Prac. & Rem. Code §§ 114.001(3), .003. There is no provision waiving sovereign immunity when the State is the party to the contract. There is similarly no provision waiving sovereign immunity for an agency that is not a party to the contract. The legislature used express language in making the State the lessee in Chapter 2167 and waiving sovereign immunity for only state agencies in Chapter 114. Because the State is not a state agency, and neither HHSC nor TFC are parties to the contract, the waiver of immunity in Chapter 114 does not apply to them. While Appellee attempts to minimize these distinctions by creating terms to collectively refer to the State, HHSC and TFC, these distinctions are real and meaningful.

20

As Appellee notes in its brief, when an agent (TFC) signs a contract on behalf of a principal (State lessee), the agent is not liable under the contract. Appellee's Brief at 24. That is exactly what Appellee is asking the Court to do. While Chapter 2167 makes clear the State, and not TFC, is the lessee, Appellee asks this Court to defy agency/principal issues—as well as express statutory language and Lease language—and find TFC, who does not pay for the Lease and HHSC, who is not a party to the Lease, liable under this Lease.

**B.     The allegations show the Lease was complied with so there is no breach of any express provision.**

Additionally, Chapter 114 does not apply because there was no breach of any express provision as required. Tex. Civ. Prac. & Rem Code § 114.003. According to the allegations and the record, Appellants complied with the Lease. Appellee's assert a breach of contract claim. The provision relied on states:

> 4.     MONTHLY RENTAL
>
> The Lessee agrees to pay Lessor a base Monthly Rent during the term of this lease in accordance with the Rent Schedule as detailed in Exhibit A. The rental payments provided for herein shall be due and payable by Lessee in advance on the first day of the month for which said rentals are due.
>
> This lease contract is made and entered into in accordance with and subject to the provisions of the Texas Constitution and the Texas Government Code, Title 10, Subtitle D, and is made contingent upon the continuation of the availability of money appropriated by the legislature to pay for the lease. In the event the Legislature or the Executive Branch of the State of Texas cease to fund the lease, or the agency ceases to exist as a result of the Legislative sunset review process, then the Texas Facilities Commission, hereinafter referred to as Commission, may assign another state agency with comparable use (General Office/Administrative and Professional Services which do not involve on-site customer/client services) to the space, or a part thereof, covered by this lease. Should the Commission be unable to find another State agency or agencies to fill, or partially fill the space, the Commission, upon written notice to the Lessor, either may terminate this lease, or sublet in whole or in part to a private third party.

CR at 23. This provision requires monthly rent. However, no rent is due if the lease is terminated. Appellee acknowledges the steps that were taken to terminate in

accordance with the Texas Government Code and terms of the Lease. Appellee's Brief at 8-9. HHSC evaluated its appropriated funds, determined it did not have the continuation of funds from the legislature to pay for the Lease, and did not certify that funds were available. CR at 316-318; 330-337. TFC notified Appellee of termination due to the lack of appropriated funds. CR at 320-21. To the extent Appellee is relying on what it deems an invalid termination, all steps under the contract and statutes for termination occurred. CR at 23. However, in Appellee's opinion, HHSC was incorrect in exercising its business judgment and should have certified the funds for Appellee's Lease because there was no justification for HHSC not to certify. But Appellee does not get to substitute its business judgment for that of the agency. As discussed, there are many variables and complexities involved.

Importantly, HHSC's decision involved assessing what may happen in the future, factoring in items such as the number of leases involved, lease support costs, and CPI rent increases, for example—it would be impossible in this complex scenario to find HHSC was required to certify funds were available to pay for this particular Lease. Because there could be no showing the termination was invalid, and all the steps required for termination occurred, there is no express provision that could have been breached. To the extent Appellee relies on the breach of the rental payment obligation provision, Appellee's argument fails because the lease did not require rental payments after the termination.

Notably absent from the record is any documentation Appellee treated the Lease as anything but terminated. For example, there are no CPI rent increase

calculations. There is no letter from Appellee telling Appellants not to vacate and vacating would be a breach. Further, there is no express provision HHSC or TFC could have breached because they were not parties to the contract. TFC did not breach any express provision of the lease; it acted to terminate the lease ono behalf of the State once the occupying agency notified it that funds were not available and did not certify funds were available. This is exactly what TFC was supposed to do. Because there is no express provision that was breached according to the allegations, for this additional reason, this Lease does not come within Chapter 114.

## II. Appellants acted in accordance with their authority under the law; there is no viable ultra vires cause of action.

Appellee claims Niles from HHSC acted ultra vires by failing to certify there were funds available to pay the Lease and that Novak of TFC acted ultra vires because he had no authority to terminate the lease. However, as discussed below and in Appellants' Brief, the ultra vires claims against Niles and Novak are without merit.

### A. Niles was not required to certify funds were available to pay for the Lease.

Chapter 2167 requires a state agency occupying leased space to certify whether money is available to pay leases before the next fiscal biennium. Tex. Gov't. Code § 2167.101. Specifically, this provision states:

> CERTIFICATION OF AVAILABLE MONEY. A state agency occupying space leased under this chapter shall certify to the commission [TFC], at least 60 days before the beginning of each fiscal biennium during the lease term, that money is available to pay for the

23

lease until the end of the next fiscal biennium.

*Id.* Implicit within this provision is a requirement that the state agency determine whether money is, in fact, available to pay for the lease through the end of the next fiscal biennium—obviously, if the funds were not available to the occupying agency, then the agency would not certify and would not be required to certify. Certainly, the legislature would not want an agency to certify available funding knowing the appropriations received would not be sufficient to cover all expenses. Nevertheless, Appellee argues the funds were available and "Niles failed to perform his ministerial duty to certify that money was available for the Broadmoor Lease." Appellee's Brief at 58. Appellee appears to misunderstand how state agencies receive appropriations from the legislature and mischaracterizes this determination as "ministerial." Appellee claims it was simple math, but fails to account for other leasing expenses (lease support costs, future needs, etc.) and variables that necessarily required deliberation and discretion by the agency.

Appellee relies on faulty premises such as HHSC received more than it requested for lease rent. That is incorrect. HHSC received $16 million less than it requested for FY24 and $27 million less than it requested for FY25.

Additionally, the monthly lease costs were not fixed—lease support costs fluctuate over time. Monthly rent for each lease is evaluated annually for increases

based on the CPI increase at the time. Despite Appellee's belief to the contrary, certifying whether funding was available for any particular lease did not involve a line-by-line comparison and was more complex than simply adding up the total leases to see if funding would cover rent.

For the same reasons that it was not readily apparent whether funding would or would not be available for any given lease, determining whether to certify funds for Appellee's lease was not a purely ministerial act. To constitute a purely ministerial act, the law must "prescribe[] and define[] the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Sw. Bell Tel., L.P. v. Emmett*, 459 S.W.3d 578, 587 (Tex. 2015) (quoting *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex. 1994)). "Conversely, 'discretionary acts' are those that 'require the exercise of judgment and personal deliberation.'" *City of Houston v. Houston Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 576 (Tex. 2018) (quoting *Sw. Bell*, 459 S.W.3d at 587).

The General Appropriations Act does not list out each individual lease wherein HHSC occupies space, nor does it provide a detailed mandate for how appropriated funds should be spent. *See* Act of May 27, 2023, 88th Leg., R.S., ch. 1170 § 1, art. II sec. 1 at II-42. Instead, funds are earmarked for general areas such as "salaries and wages," "utilities," "travel," and "rent – building," to name a few. *Id* Over a biennium, circumstances may change. For example, employees were

25

returning to the office from the pandemic, particularly in client-facing programs; utilities for those offices were likely to be higher than other offices and HHSC needed the flexibility and discretion to appropriate funds for utilities to those offices with higher usage. The legislature didn't intend to micromanage how funds earmarked for utilities would be spent at any particular office just like it didn't mandate spending of "rent-building" funds for any one particular lease. The legislature understood that some level of discretion would be necessary for HHSC to efficiently operate as a steward of taxpayer money. Because the determination as to whether the appropriated funds were sufficient to cover all lease expenses is not prescribed with such precision as to leave nothing to the exercise of discretion and judgment by HHSC, the certification of available funds cannot be a purely ministerial act and thus, does not give rise to an *ultra vires* action.

Appellee relies on a false premise that HHSC knew what future lease costs were going to be when it notified TFC it was terminating the lease. Practically all leases had CPI escalations clauses, so this premise is false. Appellee claims HHSC was appropriated more than it requested and more than it could have estimated. This is false. CR at 270; Appellee's Brief at 13, 171 (Tab 6) (showing the difference between what was requested and what was appropriated was $16 million less than requested for FY24 and $27 million less than requested for FY25). The CPI was increasing significantly during the time period before these decisions were made.

26

Given the increasing costs, some would say it was prudent for HHSC to start planning on how to address the sky-rocketing lease costs and possibility that these costs would keep increasing.

Appellee also asserts HHSC began moving out of the Lease facilities in January 2023. *See, e.g.,* Appellee's brief at 10 (referring to CR 317) (CR 317 is a notification from May 2023). This is nothing more than a red herring. Importantly, decisions ensuring allocated funds are available for leases are only made once every two years, prior to each legislative biennium. It makes sense HHSC would be planning and evaluating all contingencies and making necessary determinations as needs arise. In early 2023, the CPI had been skyrocketing in historic proportions. HHSC's appropriation request shows HHSC had serious concerns about the increasing lease and lease support costs.

Niles and HHSC did exactly what it was required to do within its discretion under the law. While Appellee does not like what HHSC did and does not agree with the decision, it was within Niles and HHSC's discretion. Appellee's allegations do not rise to a viable ultra vires claim against Niles.

## B.  Novak and TFC properly terminated the Lease.

Appellee asserts Novak was not authorized to terminate the lease and doing so was ultra vires. Appellee's Brief at 49-60. However, Novak, acting on behalf of

the State through his position at TFC, did have authority and the obligation to terminate the Lease and properly did so.

## 1. There is no legal requirement that TFC or Novak do an independent determination regarding HHSC's funding.

Chapter 2167 provides that, "A lease contract is contingent on the availability of money appropriated by the legislature to pay for the lease." Tex. Gov't Code § 2167.055(e). Because the Texas legislature appropriates funds every two years, it is unknown if the legislature will appropriate funds to cover the lease beyond the current funding biennium. In order to address the fact funds are appropriated every biennium, Chapter 2167 requires occupying state agencies to certify funds are available during the lease terms and before each biennium. Tex. Gov't Code § 2167.101. Specifically, section 2167.101 states:

> CERTIFICATION OF AVAILABLE MONEY. A state agency occupying space leased under this chapter shall certify to the commission, at least 60 days before the beginning of each fiscal biennium during the lease term, that money is available to pay for the lease until the end of the next fiscal biennium.

*Id.* Pursuant to this section, a state agency is required to certify during the lease term for each biennium. According to Chapter 2167, a lease contract is contingent on the availability of funds to pay for the lease and a certification that funds are available is required by the occupying agency for every biennium after the lease is executed during the term of the lease. These statutes reflect an intent that the State not enter into a lease or continue in a lease unless the occupying state agency determines and certifies funds are available.

Appellee claims Novak lacked authority to terminate the lease because Novak could not conclude money was not available. To the contrary, Novak actually had an obligation under the statute to terminate the Lease on behalf of the State. There is no statutory or regulatory requirement that TFC make an independent determination regarding the occupying agency's available funds. Novak was not required to familiarize himself with the occupying agency's funding concerns and analysis nor was he required to conduct his own independent analysis. There is no requirement in the law for TFC to do this. What is clear under the law is that it is the occupying agency that is responsible for determining whether funding is available to that occupying agency. *See* Tex. Gov't Code § 2167.101. Contrary to Appellee's assertion to the contrary, the legislature chose not to require TFC to conduct an independent and duplicate determination. When funding is not certified by the occupying agency, there are no funds to continue the lease and TFC has an obligation under the statute and the lease to terminate for a lack of funding. Thus, Novak's action does not amount to a viable claim that he was acting ultra vires when he did not second guess HHSC's determination.

### 2. There was no authority or reason for TFC or Novak to question HHSC's funding determination.

Similar to the allegations against Niles, Appellee argues if Novak did his own independent analysis, Novak would have necessarily concluded funding is available. Appellee's brief at 52. Putting aside that Novak had no obligation under the law to complete his own independent analysis, for the same reasons Niles was within his

29

authority in not certifying funds were available, Novak had no authority or reason to second guess HHSC or intervene and deny HHSC's request to terminate.

Appellee relies heavily on the idea Niles certified "$93 million in annual lease obligations for the next biennium" and terminated the Lease even though HHSC was appropriated $118 million for FY 2024. Appellee's Brief at 52. Appellee claims it was "easy math" and Novak was required to dispute HHSC's failure to certify. *See*, e.g., Appellee's Brief at 56. Yet, an actual review of the information available at the time these decisions were made shows it was not that simple.

Appellee's claim that Niles certified $93 million in lease obligations misconstrues what the record reveals that number actually reflected. Specifically, this $93 million figure comes from a July 27, 2023 letter HHSC wrote in response to a letter request from TFC to certify current leases. CR at 330. TFC's letter attached a spreadsheet of all leases HHSC had. CR at 323-28. In HHSC's response letter, Niles reported five leases will no longer be active. CR at 330. Niles attached a spreadsheet to the letter, without the five leases that were not being certified, and estimated that the annual amount of those remaining leases for FY24 was $93.7 million. CR at 330, 333-37. However, this was only an estimate. First, the leases, including the Lease at issue in this case, included CPI escalation clauses. Appellee's brief at 172 (Tab 6) (HHSC appropriations request says all leases had these clauses); Appellee's Brief at 79-81 (Tab 1) (showing Lease is on the State lease template and contains the CPI escalation clause). As discussed above, these clauses allow for annual rent increases based on the CPI. Even Appellee acknowledges that Niles was

providing an estimate, commending him for being "almost spot on" when HHSC actually spent $95 million for FY24. Appellee's Brief at n.72. Since a certification is committing that amounts will be available in the future, taking into account potential unknown contingencies, it is prudent to leave room for contingencies when predicting and committing to future funds. HHSC knew it had to deal with many variables and future contingencies, so it was not ultra vires to exercise discretion, after consideration of relevant factors, to certify less than the total amount appropriated. Neither TFC nor Novak had responsibility to do its own evaluation of HHSC's funding.

Moreover, TFC acting as an agent of the State could not continue the Lease if the occupying agency does not certify funds were available. TFC does not have funding to pay for the Lease and has no control over HHSC regarding payment for the Lease. Termination by TFC via Novak was certainly in compliance with the law.

Appellee's reference to TFC's rules at 1 Tex. Admin. Code §§ 115.20-.22 are irrelevant because these 2016 regulations were not in existence at the time the 2014 Lease was entered into so these regulations do not apply to this Lease. *See Progressive Cnty. Mut. Ins. Co. v. Caltzonsing*, 658 S.W.3d 384, 393 (Tex. App.—Corpus Christi-Edinburg 2022, no pet.).

**C.** **Appellee's ultra vires claim fails because Appellee seeks retroactive relief.**

Appellee claims it seeks prospective relief only but in a practical sense, that is clearly not the case. Appellee requests an injunction that, if granted, necessarily requires retroactive relief.

Appellee mischaracterizes its request as a prospective injunction that would seek to undo the 2023 decision and mandate a certification that funds were available for rent for the 2024-2025 Biennium. Appellee's Brief at 61. Appellee also wants to retract the termination of the Lease—in other words, Appellee seeks to undo an alleged wrongful act in the past. *Id.* Both of these provisions seek to undo an action that has already occurred. Texas courts have consistently held that "[i]f the injury has already occurred and the only plausible remedy is monetary damages, an *ultra vires* claim will not lie." *City of Houston v. Houston Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 576 (citing *City of El Paso v. Heinrich*, 284 S.W.3d 366, 374 (Tex. 2009)). The certification of funds as well as the termination of the Lease, happened in the past.

HHSC vacated the premises, and Appellee has had the use of its facility since September 1, 2023. There is no allegation Appellants are continuing to terminate Appellee's leases without authorization. There is no allegation Appellants continue to fail to certify funds when they are so required. This entire lawsuit concerns one instance and one lease from the past; it is not an ongoing violation. Appellee seeks to improperly "undo" prior acts. *See Southwest Pharmacy Sols., Inc. v. Texas Health & Human Servs. Comm'n*, No. 03-11-00802-CV, 2013 WL 3336868, at *2 (Tex.

32

App.—Austin June 27, 2013, no pet.) (mem. op.). For these reasons, Appellee's ultra vires claims against Niles and Novak fail and must be dismissed for lack of jurisdiction.

### III. Appellee's UDJA claim is an improper attempt to circumvent sovereign immunity's bar on Appellee's breach of contract claim.

This is a breach of contract case, pure and simple, which is barred by sovereign immunity. Appellee, aware of this bar, seeks to circumvent sovereign immunity with a UDJA claim asking this Court to declare what the legislature did not—that funds were specifically allocated for Appellee's Lease.

Appellee fails to identify precedent showing a private party can sue a state agency for a declaration to establish that the private party was specifically allocated funds in a *general* allocation bill.[3] In fact, the allocation bill does not mention Appellee at all. Act of May 27, 2023, 88th Leg., R.S., ch. 1170 § 1, art. II sec. 1 at II-42. Appellee is impermissibly attempting to get a judicial interpretation of a provision in the Legislature's allocation of funds to state agencies.

Additionally, the UDJA does not enlarge the trial court's jurisdiction and cannot be used to circumvent sovereign immunity in a breach of contract claim. *See Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 622-23 (Tex. 2011). Here, the UDJA request is solely in support of Appellee's breach of contract claim. Appellee seeks

---

[3] Appellants acknowledge that the General Appropriations Act does allocate funds to specific individuals for settlements and judgments, but such appropriations are not applicable or relevant here.

the declaration in an attempt to show Appellants breached the Lease. Since there is no waiver of sovereign immunity for Appellee's breach of contract claim, the UDJA cannot be used to establish a waiver of sovereign immunity as to Appellee's claims.

## CONCLUSION

For these reasons, Appellants respectfully request that this Court reverse the partial denial of Appellants' plea to the jurisdiction and dismiss with prejudice Appellee's claims against all Appellants.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

*/s/ Jennifer Cook*

JENNIFER COOK
Texas Bar No. 00789233
Assistant Attorney General
P.O. Box 12548/Mail Stop 019-1
Austin, Texas 78711-2548
Tel: (737) 230-4700
Fax: (512) 302-0667

jennifer.cook@oag.texas.gov

**Counsel for Appellants**

## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this reply brief contains 6688 words, excluding the portions of the brief exempted by Rule 9.4(i)(1), as calculated by Microsoft Office 360.

*/s/ Jennifer Cook*
Jennifer Cook
Assistant Attorney General

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 102999349
Filing Code Description: Other Brief
Filing Description: 20250710_Appellants Reply Brief
Status as of 7/11/2025 7:16 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michaelle Peters | | mpeters@scottdoug.com | 7/10/2025 4:53:04 PM | SENT |
| Angela Goldberg | | agoldberg@scottdoug.com | 7/10/2025 4:53:04 PM | SENT |
| Susie Smith | | ssmith@scottdoug.com | 7/10/2025 4:53:04 PM | SENT |
| Jason R.LaFond | | jlafond@scottdoug.com | 7/10/2025 4:53:04 PM | SENT |
| Kemp Kasling | | kkasling@kaslinglaw.com | 7/10/2025 4:53:04 PM | SENT |
| Angie Espinoza | | aespinoza@scottdoug.com | 7/10/2025 4:53:04 PM | SENT |
| Carla Matheson | | cmatheson@scottdoug.com | 7/10/2025 4:53:04 PM | SENT |

Associated Case Party: State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Victoria Gomez | | victoria.gomez@oag.texas.gov | 7/10/2025 4:53:04 PM | SENT |
| Jennifer Cook | | Jennifer.Cook@oag.texas.gov | 7/10/2025 4:53:04 PM | SENT |

Associated Case Party: Broadmoor Austin Associates, a Texas Joint Venture

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Sara W.Clark | | sclark@scottdoug.com | 7/10/2025 4:53:04 PM | SENT |
| Casey Dobson | | cdobson@scottdoug.com | 7/10/2025 4:53:04 PM | SENT |